**IN THE COURT OF APPEALS OF IOWA**

No. 15-1429
Filed April 27, 2016


IN RE THE MARRIAGE OF RACHEL JOANN GEMMELL
AND ANDREW NEAL GEMMELL

Upon the Petition of
**RACHEL JOANN GEMMELL,**
        Petitioner-Appellant/Cross-Appellee,

**And Concerning**
**ANDREW NEAL GEMMELL,**
        Respondent-Appellee/Cross-Appellant.
_____


        Appeal from the Iowa District Court for Mahaska County, Lucy J. Gamon,

Judge.

        The former wife appeals the district court's rulings on physical care,

spousal support, and contempt, and the former husband challenges the attorney-

fees order.  **AFFIRMED.**


        Diane Crookham-Johnson of Crookham-Johnson Law Office, P.L.L.C.,

Oskaloosa, and Philip J. De Koster of De Koster & De Koster, P.L.L.C., Hull, for

appellant.

        Heather M. Simplot of Harrison, Moreland, Webber & Simplot, P.C.,

Ottumwa, for appellee.


        Heard by Danilson, C.J., and Vaitheswaran and Tabor, JJ.

**TABOR, Judge.**

Rachel Gemmell appeals the dissolution decree's provisions (1) granting Andrew Gemmell physical care of the parties' son, D.G., (2) declining her request for spousal support, and (3) finding her in contempt for willfully denying visitation. Andrew cross-appeals the provision requiring him to pay Rachel's attorney fees. After reviewing the record de novo, we conclude D.G.'s best interests are served by granting physical care to Andrew, the court did not fail to do equity by denying spousal support, and Rachel willfully denied visitation. Finally, the district court did not abuse its discretion in ordering Andrew to pay a portion of Rachel's attorney fees.

## I. Facts and Prior Proceedings

Rachel and Andrew married in August 2003. Before their marriage, Andrew completed high school, but Rachel had dropped out. Andrew joined the Army and was posted to South Korea for two years, where Rachel joined him. D.G. was born in 2005. Cathy, Andrew's mother, visited South Korea and helped take care of D.G. When D.G. was two-months old, the family left Korea, returned to Iowa, and lived with Cathy. After one month, Andrew left to finding housing for his next posting in Texas. Rachel and D.G. continued living with Cathy for another month and then joined Andrew in Texas. Over the ensuing years, Cathy provided financial, practical, and emotional support for Andrew, Rachel, and D.G.

The parties lived together on the Texas base for six months. In April 2006, Andrew and Rachel had a fight during which they slapped and kicked each other. Rachel called the military police, who investigated both parties. No criminal charges were filed. Rachel returned to Iowa with ten-month-old D.G.

After living with her mother in Oskaloosa, she moved into her own apartment. Cathy helped Rachel furnish her Oskaloosa apartment, including buying beds for Rachel and D.G. Rachel worked part time at the Oskaloosa Hy-Vee and supplemented her income with government assistance. After Rachel moved back to Iowa in April, Andrew and Rachel were together for one night when he visited Iowa in August 2006. Andrew was honorably discharged in 2007 and worked as a volunteer firefighter in Texas. The parties communicated by telephone, text, and video-chat.

After Andrew sent Rachel divorce papers, Cathy took Rachel to see an attorney. The attorney told Rachel the papers were not valid. When Andrew and his girlfriend in Texas broke up, Andrew burned her letters and, in the process, set their residence on fire. Andrew called Rachel from a Texas jail. Andrew pleaded guilty to arson, received a deferred adjudication and probation, and was ordered to pay restitution. A probation condition prohibited Andrew from leaving Texas. In another setback for Andrew, he was hit and seriously injured as he directed traffic at an accident scene, which prevented him from working from 2008 to 2010.

After Cathy paid Andrew's travel expenses, he spent one week at Rachel's apartment in Christmas 2010. The district court found Andrew "rarely saw" D.G. after Rachel moved back to Iowa, and he provided "no financial support during this time." The court credited Andrew's testimony that he had "at least monthly video chats" with D.G. but ruled he "could and should have done more to maintain a bond with his son."

Based on Cathy's communications with the Texas probation office and on Andrew having paid the majority of his restitution, Andrew was allowed to leave Texas in March 2011. Andrew immediately returned to Iowa, lived with Cathy, and according to Rachel, tried to see D.G. every day. The court found: "To Andrew's credit, he did move back to Iowa and attempt to reconcile with Rachel as soon as he had paid enough of his restitution." The parties reunited in August 2011 and moved to Knoxville. D.G. attended Knoxville schools for first through fourth grade. Rachel attended parent-teacher conferences, and the school called Rachel if D.G. was sick.

Regarding the parties' employment, Rachel worked at the Knoxville Hy-Vee, making $9.60 per hour while working twenty-four to thirty hours per week. Although Rachel has asked for more hours, Hy-Vee has been unwilling to accommodate her request. At trial, Rachel agreed to have a full-time minimum wage attributed to her for child-support purposes. Upon his return to Iowa, Andrew first worked for a temp agency, earning $24,600 in 2011. Once Andrew obtained full-time employment, he provided the family's medical insurance. Andrew's income increased from $37,200 in 2012 to $49,800 in 2013. Rachel testified Andrew was with her and D.G. "anytime" he was not at work. Andrew has completed two years of college.

Rachel testified Andrew had issues with alcohol, which led to arguments. When their relationship deteriorated, Rachel talked to Andrew about marriage counselling. Rachel also talked to Cathy, who encouraged Andrew to try marriage counselling. But the couple's attempt to reconcile was ultimately unsuccessful.

**Separation.** After Andrew moved out of the marital home in July 2014, he made many attempts to contact D.G. But for two months Rachel did not allow contact—conduct the district court characterized as an "unreasonable refusal."

During the parties' separation, Andrew reconnected with Marshina, whom he had dated in high school. Andrew moved into Marshina's residence in Oskaloosa. Marshina is a nurse with a college degree and splits physical care of her two daughters equally with their father. The girls are similar in age to D.G.

His parents' separation impacted D.G.'s activities. Andrew's family had been very involved in youth soccer, and Andrew encouraged D.G. to be active in soccer and other sports, such as archery and swimming. D.G. played soccer every year the parties were together, and Andrew paid D.G.'s registration for the fall 2014 season, D.G.'s fourth-grade year. But D.G. did not play soccer in 2014. Initially, his team did not have a coach. When a coach was found, D.G. missed the first practice, and Rachel did not take him thereafter. Andrew claims Rachel did not encourage soccer due to Andrew being able to see D.G. at the games. From August 2014 to the July 2015 dissolution trial, D.G. gained forty-five pounds. The court found: "In Rachel's home, D.G. is allowed to spend a great deal of time indoors, engaged in passive activities such as playing videogames and does not always receive a healthy diet."

After the parties separated, Andrew obtained a new job in Des Moines. He is a production manager with flexible hours, earning $79,600 annually. The record shows the parties do not communicate well. Andrew did not tell Rachel he had a new job.

**Temporary Order.** The court signed the parties' stipulated order on temporary matters, and filed it at noon on October 3, 2014. Andrew was ordered to pay temporary child support of $730 per month. The order also provided for joint legal custody with Andrew parenting every other weekend, *beginning on October 3*. Andrew had midweek visitation every Wednesday evening. The court's handwritten notation at the bottom of the order stated: "Original signature pages shall be provided to the court by October 10, 2014, at 9:00 a.m." Despite the court filing the order with the handwritten notation, Rachel refused to allow Andrew to exercise his October 3 visitation, stating he could not see D.G. that weekend because he had not yet signed the *original* signature page.

Andrew's midweek visits also were a point of contention. Because Rachel did not like Andrew taking D.G. to Oskaloosa for a family dinner with Marshina, Rachel told Andrew he should spend Wednesdays in Knoxville with D.G. But at trial, Rachel admitted Andrew was always alone on Wednesdays when he picked up D.G., which resulted in father-son time during the drive from Knoxville to Oskaloosa.

Similarly, Rachel was upset by the weekend visitation exchanges. The court found both Andrew and Marshina credibly testified that at those exchanges Rachel would use inappropriate language, denigrating Marshina in front of D.G. At the end of November, Andrew arrived at Rachel's house in Knoxville to pick up D.G. for the Thanksgiving weekend. Rachel slammed the door on Andrew and refused to let D.G. leave, claiming Andrew had been drinking. Andrew called law enforcement, offered to take a breath test, and insisted he had not been drinking. The responding officer talked to Andrew and declined to take action in a "civil

dispute." Andrew went home, but he returned to Knoxville on Saturday for a second attempt at his weekend visitation. Rachel claimed he was pounding on the door, and she refused to answer. Andrew filed a motion for rule to show cause. The court consolidated the dissolution and Andrew's contempt action.

In the summer of 2015, while she was receiving more than $700 a month in temporary child support, Rachel believed she could not afford gas money to have her mother in Oskaloosa care for D.G. as in past summers. Andrew points out Rachel's mother lives near Marshina. Without telling Andrew, Rachel enlisted her neighbors across the street to watch D.G. for the summer. The district court found Rachel exhibited "questionable judgment" in making this choice: "One of these neighbors was recently released from prison stemming from a felony drug conviction. Rachel showed no concern about this fact, and it was not clear that she had done any investigation before choosing these neighbors to care for her child."

**Trial.** A two-day trial to the court commenced on July 1, 2015. The court found Rachel had not attended a Children-in-the-Middle class, despite a court order to complete the class by February 1, 2015. The court ordered Rachel to complete the class, and she committed to do so. Andrew sought physical care and, alternatively, joint physical care. Rachel sought physical care but did not seek joint physical care. Rachel asked the court to eliminate Andrew's midweek visitation during the school year, claiming D.G. could not get his homework done. Andrew testified he was willing to help D.G. with his homework on Wednesdays.

**Physical Care Ruling.** In a lengthy and detailed opinion considering the appropriate factors, the district court granted physical care to Andrew with liberal

visitation to Rachel, including overnight every Wednesday and every other weekend. The court recognized Rachel "has not always been supportive of Andrew's involvement" with D.G., recently preventing any parenting time "for nearly two months" despite Andrew "consistently begging" for visitation. The court found D.G. and Andrew have a "very close relationship."

The court acknowledged D.G. had been able to rely on Rachel "his entire life" and Rachel has been his primary caretaker. Despite these undisputed facts, the court found it was not clear D.G. has a closer bond with Rachel than he has with Andrew. The court explained Cathy had the opportunity to observe Rachel's relationship with D.G. on a consistent basis and after such observation, Cathy viewed Rachel as a "disinterested parent." While recognizing "a mother-in-law is not always an unbiased witness," the court noted Cathy "had been a continual source of encouragement and support for Rachel" and "Rachel did not rebut any of Cathy's testimony." The court found credible evidence showed Rachel was "subject to fits of anger in which she yells at D.G. or in his presence, and which sometimes involve squeezing, pinching, or other physical abuse of D.G."

The court discussed the effect of D.G. switching households and believed D.G. "would be able to handle this disruption" and "could readily adapt to Andrew's home environment, with which he is already familiar." The court found the credible testimony of Andrew and Marshina showed "D.G. loves coming to their home for visits, gets along very well with Marshina's children, engages in all family activities with gusto, and becomes quiet and sad when it is time for his visits to end." Because D.G.'s weekend visitations with Andrew had gone well, the court opined "it seems very likely [D.G.] will quickly adjust to living in his

father's household full time." Further, Andrew's willingness to keep D.G. enrolled in Knoxville schools "would allow a measure of stability and continuity" for D.G., helping him "to adapt to a different home."

The court stated D.G. loved both his parents and would benefit from time with both of them. The court found Andrew "will best guide D.G. into a successful and productive childhood," having "shown the interest and ability to provide D.G. with intellectual, physical, and social stimulation and challenges in a way that Rachel has not." The court opined D.G. was most likely to reach his full potential in Andrew's home.[1] The court ordered Rachel to pay Andrew $143.15 per month in child support.

**Alimony Ruling.** The court denied Rachel's request Andrew pay rehabilitative alimony of $850 per month for ten years. The court found Cathy credibly testified she had repeatedly encouraged Rachel to take different "advanced training or education, even offering to pay for a [CNA] class." Despite Cathy's offers and encouragement, "Rachel showed no interest at all in furthering her training or her education."

Based on Cathy's detailed testimony and Rachel's conclusory testimony to her future education goals and plans, the court found it "unlikely Rachel would actually use any spousal support to further her education." The court also noted Rachel apparently would lose $375 in monthly housing assistance upon receiving alimony. Jointly considering Rachel's alimony request and the division of

---

[1] The district court considered and rejected Andrew's request for shared physical care, noting the parties' "very poor ability to communicate with each other." Because we are affirming the district court's grant of physical care to Andrew, we need not address Andrew's alternative request on appeal for joint physical care.

property, the court concluded it was "much more practical for Andrew to shoulder the lion's share of the parties' marital debts rather than for him to pay Rachel alimony." The court noted Rachel had always lived frugally and "has always previously managed to get by with the help of government assistance." Further, "Rachel has the capability of working full time, but has chosen not to do so." Finally, the court noted "Andrew obtained his current job with its high salary only after the parties were separated."

**Contempt Ruling.** The court found Rachel willfully violated the temporary order establishing visitation. The court rejected Rachel's defense that Andrew had been drinking, finding this defense "was not substantiated by the police," who would have investigated and been interested if Andrew "had been drinking to the extent that he ought not to be driving with a child in the vehicle." Specifically, the fact the police were not interested in the parties' "civil dispute" demonstrated Andrew had not committed any alcohol-related crime. Additionally:

> Rachel's willful violation of the court order was compounded when [she] refused to even answer the door on the following Saturday. Since she did not answer the door, she could have had no idea whether Andrew had been drinking on that date. At that point, Rachel was simply willfully refusing visitation without any even possible justification.

The court observed Rachel's willful actions showed "a woeful lack of respect" for Andrew's role as D.G.'s father, and "was a factor" in the court determining D.G.'s "best interest would be served by residing primarily in his father's care." The court ordered Rachel to allow Andrew to make up his "lost weekend" and to provide an additional weekend.

**Attorney-Fees Ruling.** Noting the current disparity in the parties' incomes and the fact "Rachel's current monthly expenses substantially exceed her current net income," the court ordered Andrew to pay $5000 towards Rachel's $7500 in attorney fees at the rate of $500 per month.

Rachel now appeals, and Andrew cross-appeals.

## II. Standard of Review

We review dissolution of marriage cases do novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). Although we decide the issues anew, we give weight to the factual findings, especially in regard to witness credibility. *Id.* When it comes to the credibility of witnesses, "[t]here is good reason for us to pay very close attention to the trial court's assessment." *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984). The trial court "is greatly helped in making a wise decision about the parties by listening to them and watching them in person." *In re Marriage of Callahan*, 214 N.W.2d 133, 136 (Iowa 1974); *see Vrban*, 359 N.W.2d at 423 (stating appellate courts necessarily forfeit the impressions created by the parties' demeanors).

"Contempt can be described as willful disobedience." *Ervin v. Iowa Dist. Ct.*, 495 N.W.2d 742, 744 (Iowa 1993). An appeal from a contempt order is limited to determining if the district court acted without jurisdiction. *In re Marriage of Stephens*, 810 N.W.2d 523, 529 (Iowa Ct. App. 2012). Review is at law. *Id.*

## III. Analysis

### A. Physical Care

Rachel requests we grant her physical care of D.G. Physical care is the right and responsibility to maintain a home for the child and provide for the child's

routine care. *In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007). The objective of a decision about physical care is to place the child in the environment most likely to foster his physical and mental health and social maturity. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007).

In determining a child's best interest, we consider numerous factors, including but not limited to the suitability of parents, the child's psychological and emotional needs and development, the quality of parental communication, the previous pattern of caregiving by the parents, and each parent's support of the other. *See id.* at 696; *see also* Iowa Code § 598.41(3) (2013). Turning to those factors, it is undisputed Rachel has been D.G.'s primary caregiver throughout his life, and she correctly asserts we give consideration to placing a child with the historical caregiver. *See In re Marriage of Decker*, 666 N.W.2d 175, 178–80 (Iowa Ct. App. 2003). In contrast, a strong commitment to his son is relatively new for Andrew. But Andrew correctly points out the historical-caregiver role is only one factor to be considered and "no one criterion is determinative." *See Hansen*, 733 N.W.2d at 697.

Most significantly, we find Rachel has proved unwilling to support Andrew's role as a father. *See id.* at 700 ("The parent awarded physical care is required to support the other parent's relationship with the child."); *see also* Iowa Code § 598.41(1)(c) ("The court shall consider the denial of one parent of the child's opportunity for maximum continuing contact with the other parent, without just cause, a significant factor in determining the proper custody arrangement."). Shortly after Rachel unreasonably withheld two months of *any* contact, she willfully caused D.G. to forgo his Thanksgiving weekend with Andrew. Rachel

has acted inappropriately in front of D.G. during visitation exchanges. Andrew recognized in his testimony that D.G. felt "caught in the middle" of his parents' separation, while Rachel failed to attend the class discussing such issues.

Andrew, more so than Rachel, has placed importance on D.G.'s socialization and fitness needs. Andrew also has closely bonded to D.G., despite being largely absent from his life for several years. On the other side of the coin, Rachel has had stable employment and carried on the parenting of D.G. in the early years without support from Andrew, though with consistent support from Andrew's mother. But despite being a steady presence, Rachel was credibly described as a "disinterested" mother. *See Hansen*, 733 N.W.2d at 697 ("[T]he the quality of the parent-child relationship is not always determined by hours spent together . . . ."). One example of Rachel's "disinterest" is allowing D.G. to spend the summer in the care of a convicted felon without concern or investigation.

At oral argument, Rachel's counsel was critical of the district court for placing too much emphasis on Andrew's financial wherewithal and too little emphasis on Andrew's "history" of domestic abuse. We find neither of those criticisms to be valid. In our de novo review, we do not find a history of abuse by Andrew. After balancing all of the relevant factors, we reach the same decision regarding physical care as the district court. That decision is not based on the relative incomes of the parties, but on the suitability of their parenting and their willingness to support the other's relationship with D.G.

**B. Spousal Support**

Rachel appeals the court's failure to grant her rehabilitative alimony, claiming she needs the support to continue her education and improve her employment prospects.

The goal of rehabilitative alimony is to provide the means for "an economically dependent spouse" to obtain a "limited period of re-education" post-divorce to create "incentive and opportunity for that spouse to become self-supporting." *In re Marriage of Becker*, 756 N.W.2d 822, 826 (Iowa 2008). Whether support is warranted depends on each case's "own peculiar circumstances," thus, "prior cases are of little value." *Id. a*t 825-26. "Even though our review is de novo, we accord the trial court considerable latitude in making this determination and will disturb the ruling only when there has been a failure to do equity." *In re Marriage of Benson*, 545 N.W.2d 252, 257 (Iowa 1996). We consider the property division and spousal support together. *In re Marriage of Trickey*, 589 N.W.2d 753, 756 (Iowa Ct. App. 1998).

In light of the district court's latitude in resolving such issues, we are unable to conclude the district court failed to do equity. Rachel was not absent from the job market after her return to Iowa and has supported herself in a frugal lifestyle. *See* Iowa Code § 598.21A(1)(e) (stating courts consider the "length of absence from the job market"). While she has received government assistance, Rachel acknowledged she was capable of working full time at a minimum wage, and the district court found she had chosen not to do so. Andrew's substantial increase in salary occurred after the parties shared a household. *See id.* § 598.21A(1)(f) (stating courts consider the standard of living during the

marriage). Under the award of physical care to Andrew, Rachel now has fewer responsibilities for D.G. *See id.* § 598.21A(1)(e) (stating courts consider a parent's "responsibilities for children under . . . an award of . . . physical care"); *see, e.g.*, *In re Marriage of Faidley*, 2016 WL 363650, at *4 (Iowa Ct. App. Jan. 27, 2016) (discussing interplay of spousal support and physical care). Also, we consider Rachel's request in conjunction with the property division, which neither party appealed. *See* Iowa Code § 598.21A(1)(c). Rachel received a net award of $8672, and Andrew received a negative net of $10,227. In addition to paying the marital debt, Andrew will pay the majority of Rachel's trial attorney fees. *See id.* § 598.21(A)(j) (stating courts consider other relevant factors).

We also find it significant Rachel tried only once to obtain her high school diploma before D.G. was born and declined to accept Cathy's repeated efforts to help her continue her education after D.G. was born. We, like the district court, conclude Rachel is unlikely to use any spousal support as an incentive to further her education. *See Becker*, 756 N.W.2d at 826.

### C. Contempt

Rachel claims because Andrew was intoxicated, her actions in refusing his weekend visitation were justified.

Iowa Code section 598.23(1) provides: "If a person against whom a ... final decree has been entered willfully disobeys the . . . decree, the person may be cited and punished by the court for contempt." A contempt proceeding is criminal in nature, and each element must be established beyond a reasonable doubt. *In re Marriage of Ruden*, 509 N.W.2d 494, 496 (Iowa Ct. App. 1993). We review for substantial evidence. *In re Marriage of Swan*, 526 N.W.2d 320, 326-27 (Iowa

1995). Substantial evidence is evidence that "could convince a rational trier of fact that the alleged contemner is guilty of contempt beyond a reasonable doubt." *Ervin*, 495 N.W.2d at 744-45.

We find substantial evidence to support the district court's contempt ruling, agreeing with its observation the police would not have treated the matter as a civil dispute if Andrew had, in fact, been under the influence. We also agree with the court's determination Rachel was not justified in refusing visitation on Saturday. Because Rachel's actions cannot be viewed as an isolated, non-consequential incident, we affirm.

### D. Andrew's Cross-Appeal: Trial Attorney Fees

Andrew contends the district court should not have ordered him to pay a portion of Rachel's attorney fees. Such an award is discretionary, and the district court's ruling will not be disturbed absent an abuse of discretion. *In re Marriage of Giles*, 338 N.W.2d 544, 546 (Iowa Ct. App. 1983). The controlling consideration in the attorney-fee determination is often the parties' respective abilities to pay. *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013). We conclude the court did not abuse its discretion in ordering Andrew to pay $5000 of Rachel's $7500 in attorney fees.

### E. Appellate Attorney Fees

Both parties request appellate attorney fees, which we decline to award. *See In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005) (stating appellate attorney fees are not a right but instead rest in our discretion). Costs are split one-half to each party.

**AFFIRMED.**